[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 23, 2012
JOHN LEY
CLERK

_____

No. 10-13567

_____

D.C. Docket No. 6:10-cr-00016-MSS-KRS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

OMAR ONEIL LEWIS,
a.k.a. Paul Campbell,
a.k.a. Kevin Ellis, et al.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 23, 2012)

Before MARCUS, WILSON and COX, Circuit Judges.

MARCUS, Circuit Judge:

In this interlocutory appeal, the government appeals from a district court

order granting defendant Omar Lewis's motion to suppress a firearm discovered after he and three associates were briefly detained by law enforcement officers at night in a parking lot in Orange County, Florida. What began as a consensual encounter between the officers and the four men quickly evolved into an investigatory detention and then into a probable cause arrest after one of the associates admitted to carrying a concealed firearm on his person and another admitted to having a firearm in a backpack found in the open trunk of a nearby car. The officers briefly detained all of them while further investigating possible criminal activity, and discovered a firearm on the ground near where the defendant had been seated.

The district court granted the motion to suppress the firearm, holding that the detention of Lewis was unreasonable and therefore violated the Fourth Amendment. We reverse and remand because under the peculiar facts of the case and the danger extant, it was reasonable for the officers to make a split-second decision to briefly detain all four individuals as they investigated possible violations of Florida's concealed-weapons laws.

## I.

We take the facts essentially from the district court's order granting Lewis's suppression motion and from the transcript of the suppression hearing, accepting

the trial judge's findings of fact. On the night of February 6, 2009, Deputy Noel Bojko was in uniform and on patrol with his field training officer, Deputy Scott Stiles. The two deputies were patrolling the Pine Hills area of Orange County, Florida. Around 8:50 p.m., the deputies entered the parking lot of the Seawinds restaurant, which was open for business at the time. No one disputes that the Seawinds restaurant is in a "high crime area" that is a "hotbed" of drug and gun activity.

As the deputies entered the parking lot, they observed four males standing in between two parked vehicles, one with a trunk open. The cars were parked perpendicular to the marked parking spaces in the crowded lot. At the suppression hearing, Deputy Bojko testified that the four men "were just hanging out in between the two cars," and that "[t]hey were moving around computer equipment in the . . . open trunk" of one of the cars. Both Deputies Bojko and Stiles observed that the men were just standing in the Seawinds parking lot and that there was no basis to conclude that the men were involved in the commission of a robbery, drug dealing, or any other crime.

The deputies did not immediately detain the four men, but instead approached them and engaged in a wholly consensual encounter. Deputy Bojko asked "how you guys doing" and tried "to start a casual conversation." Deputy

3

Stiles similarly testified that the deputies introduced themselves and said, "Hey, gentlemen, how is it going." According to the officers, the four men responded that "they were just hanging out in the parking lot."

Apparently the very next question asked by Deputy Bojko was whether any of the men were carrying guns. Two of the four men, Carlos Evans and Charles McRae, each responded affirmatively. The other two men, including Lewis, said nothing in response to the deputy's question. Evans told the officers that he had a handgun in a backpack in the open trunk of a car parked nearby, and McRae told the officer that he was carrying a handgun on his person, in his waistband. Deputy Bojko could see the top of the backpack in the open car trunk. There was no indication or testimony that McRae made any attempt to reach for the firearm or made any other sudden movements.

The deputies did not ask any followup questions, such as whether McRae or Evans had a valid permit for the firearms. Rather, the officers immediately drew their weapons and ordered all four men to sit down on the ground and show their hands. There is no dispute that at this point, the consensual encounter had been transformed into an investigatory stop, and that the four men were not free to leave.

Three of the four men complied immediately. Lewis, however, took some

4

ten seconds to comply. During those ten seconds, Lewis walked a few steps away from the other men. Lewis briefly had his back turned to the officers and moved away from the trunks of the parked cars and towards the front of one of the vehicles. At some point after Lewis sat down, Deputy Bojko ordered him to slide over to the other three men, and he complied.

Around this time, Corporal Steven Scott Jenny, who knew that the deputies were headed to the Seawinds restaurant, arrived on the scene. He saw all four men sitting on the ground. Corporal Jenny testified at the suppression hearing that his attention was immediately drawn to Lewis, who "looked extremely nervous, wouldn't sit still, wouldn't keep his hands in one position where we could see them. His hands were moving to his sides, towards his pockets, towards his back. He was scooting his body around." Their concern heightened by Lewis's behavior, the officers examined the ground where Lewis was previously seated and saw a semi-automatic pistol underneath a vehicle. After observing the firearm, the officers had the four men lie prone and handcuffed all of them. The officers did not observe Lewis with the firearm on his person, nor did they observe Lewis discard the weapon. Corporal Jenny concluded, however, that Lewis was the only one of the men who was in a position to be able to discard the weapon in that particular spot.

5

At that point, Lewis was arrested and charged with carrying a concealed firearm in violation of Florida law. Subsequent testing found Lewis's DNA on the gun. The weapon was later determined to be registered to McRae. The officers searched Lewis incident to his arrest and discovered the car keys to a white Honda, which was also parked in the Seawinds parking lot. The Honda contained an empty gun box that the officers concluded was used to house the firearm the officers had discovered under the car.

McRae and Evans were not arrested or charged. McRae produced a valid concealed-weapons permit at the scene. Evans, who had indicated that he had a gun in the backpack, did not have a permit but was also released. The third individual, Carlos Bayes, was released as well. Lewis was the only individual arrested and charged following these events.

**II.**

On January 27, 2010, a federal grand jury sitting in the Middle District of Florida indicted Lewis for one count of unlawful possession of a firearm by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2).[1]  Lewis

---

[1]  The district court observed that Lewis was charged with carrying a concealed firearm in violation of Florida law under Fla. Stat. § 790.01(2). While that is the crime for which he was initially arrested and charged, Lewis was later prosecuted under the federal alien-in-possession statute.

moved to suppress the seized firearm, arguing that the police lacked reasonable suspicion sufficient to detain him for further investigation under Terry v. Ohio, 392 U.S. 1 (1968), and, therefore, that their subsequent seizure violated the Fourth Amendment. In response, the government claimed that the officers engaged Lewis in a consensual encounter that appropriately evolved into a Terry detention, which in turn was transformed into a probable cause arrest after the discovery of the discarded handgun near the area where Lewis, and Lewis alone, had been sitting. The government urged that, based on the totality of the circumstances, the officers reasonably suspected criminal activity and that the brief detention of all four individuals was performed for legitimate reasons of safety.

The district court conducted a suppression hearing, at which Deputies Bojko and Stiles and Corporal Jenny were the only witnesses called. At the conclusion of the witnesses' testimony, the district court deferred ruling, ordering the parties to provide supplemental briefing on two questions: "whether the admission that you have a weapon you're entitled to have on you is a basis for a . . . Terry stop," and, "if so, whether it is a basis to stop not only you by that admission, but everybody who is standing with you."

Thereafter, the district court granted Lewis's motion and suppressed the firearm. The district court determined that the Terry stop was unlawful as to any

7

of the four individuals, even concerning the two men (McRae and Evans) who had admitted to possessing firearms. The court concluded that the officers lacked any particularized and objective suspicion that <u>any</u> of the four men had been engaged in, or were about to engage in criminal activity at the time the officers ordered the men to the ground. The record showed, the court said, that when the officers conducted the stop the four men were engaged in non-criminal activities: standing by a car; looking in the trunk of a car; talking to each other in association; standing in the parking lot of a restaurant while it was open for business; failing to park their cars in designated parking spaces in a crowded private parking lot; and <u>lawfully</u> possessing firearms. None of these activities, the trial court asserted, whether taken alone or in concert, established a reasonable basis to stop any of the men. The court reasoned that mere gun possession did not justify a <u>Terry</u> stop, because it was neither per se unlawful to possess a handgun nor illegal to admit to carrying one, and because the police had no reason to believe that McRae did not have a concealed-weapons permit for the firearm. Moreover, the restaurant and the surrounding neighborhood's "designation" as a high-crime area could not transform an unlawful detention into a reasonable <u>Terry</u> stop. Finally, the district court concluded there was no evidence or reasonable suspicion that the defendant Lewis had engaged in any criminal activity, and, therefore, there was no basis for

8

detaining him under <u>Terry v. Ohio</u>.

This timely interlocutory appeal followed; we have jurisdiction under Title 18 U.S.C. § 3731.[2]

## III.

A motion to suppress evidence presents a mixed question of law and fact. <u>United States v. Bautista-Silva</u>, 567 F.3d 1266, 1271 (11th Cir. 2009). "Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts <u>de novo</u>." <u>United States v. Jordan</u>, 635 F.3d 1181, 1185 (11th Cir. 2011) (quoting <u>United States v. Bervaldi</u>, 226 F.3d 1256, 1262 (11th Cir. 2000)). "Further, all facts are construed in the light most favorable to the prevailing party below." <u>Id.</u> (internal quotation marks omitted). Finally, we afford substantial deference to the factfinder's credibility determinations, both explicit and implicit. <u>United States v. McPhee</u>, 336 F.3d 1269, 1275 (11th Cir. 2003); <u>United States v.</u>

---

[2] Title 18 U.S.C. § 3731 provides in relevant part:

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is by now axiomatic that a court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment. Samson v. California, 547 U.S. 843, 848 (2006). Under the Supreme Court's seminal decision in Terry v. Ohio, "law enforcement officers may seize a suspect for a brief, investigatory . . . stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" Jordan, 635 F.3d at 1186 (quoting Terry, 392 U.S. at 19-20, 30). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (internal quotation marks omitted). Reasonable suspicion need not involve the observation of illegal conduct, but does require "more than just a hunch." United States v. Lee, 68 F.3d 1267, 1271 (11th Cir. 1995) (citing United States v. Sokolow, 490

10

U.S. 1, 7-8 (1989)).

As an initial matter, the officers' actions in approaching the four men late in the evening of February 6, 2009 and asking them questions did not implicate the Fourth Amendment at all. See United States v. Drayton, 536 U.S. 194, 200-01 (2002); Jordan, 635 F.3d at 1186. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." Jordan, 635 F.3d at 1186 (quoting United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003)); see Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). There is no dispute in this case that, during the initial consensual encounter, the four men, including Lewis, were free "to disregard the police and go about [their] business." California v. Hodari D., 499 U.S. 621, 628 (1991).

Plainly, what elevated the encounter from a consensual one into an investigatory detention implicating the Fourth Amendment was the officers drawing their weapons and ordering the men to sit on the ground, in response to McRae's and Evans's admissions that each of them possessed a firearm. In our view, determining whether the officers' detention of Lewis violated the Fourth Amendment requires that we engage in a two-part inquiry: first, whether McRae's admission to carrying a concealed firearm on his person provided the officers with

11

reasonable suspicion to briefly detain him under Terry; and second, if so, whether it was reasonable under all of the circumstances for the officers to detain the defendant Lewis and the others as well.

**A.**

As we see it, the district court made two fundamental and related legal errors in concluding that the officers lacked reasonable suspicion to detain any of the four men. First, the district court suggested that since the officers had no reason to suspect that McRae did not have a valid concealed-weapons permit, his admission to carrying a concealed weapon did not provide any reasonable suspicion about anything. And second, as an important part of its reasonable suspicion calculus, the district court relied on the officers' knowledge, drawn only after the unfolding detention, that McRae's firearm possession was lawful.

Based on McRae's admission that he was carrying a handgun in his waistband, the officers had reasonable suspicion to believe that McRae was committing a crime under Florida law -- carrying a concealed weapon.[3] Under

---

[3] There is no indication in the record that the officers themselves ever clearly articulated this suspected crime as the basis for the detention. However, a police officer's subjective motivations for conducting a stop have no bearing on the objective inquiry into whether the stop is reasonable under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 812-13 (1996) (rejecting argument that "an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment," and observing that the Court has "repeatedly held and asserted the contrary").

12

Florida law, "[a] person who carries a concealed firearm on or about his person commits a felony of the third degree." Fla. Stat. § 790.01(2).[4] Notably, the possession of a valid permit for a concealed weapon is not related to the elements of the crime, but rather is an affirmative defense. Fla. Stat. § 790.01(3); Watt v. State, 31 So. 3d 238, 241-42 (Fla. 4th DCA 2010).

Moreover, because reasonable suspicion analysis is not concerned with "hard certainties, but with probabilities," United States v. Cortez, 449 U.S. 411, 418 (1981), McRae's admission to carrying a concealed weapon was sufficient to justify briefly stopping him before inquiring further about whether he had an affirmative defense in the form of a valid concealed-weapons permit. The Supreme Court has made it abundantly clear that, although an individual may ultimately be engaged in conduct that is perfectly lawful -- as turned out to be the case with McRae -- officers may "detain the individual[] to resolve the ambiguity." Wardlow, 528 U.S. at 125 (citing Terry, 392 U.S. at 30); see also

---

[4] It is not altogether clear under Florida law whether Evans, who only admitted to having a firearm secured in a nearby backpack in the open trunk of a car, had a firearm "on or about his person" under the Florida concealed-weapons statute. Fla. Stat. § 790.01(2). But we need not determine whether the officers had reasonable suspicion that Evans was in violation of Florida law. The ultimate question of whether the detention of Lewis was reasonable does not turn on whether the officers had reason to believe that both McRae and Evans, or just McRae alone, violated Florida's concealed-weapons statute. For our purposes, it's enough that the deputies had reason to believe that McRae had violated the penal statute, and, as we explain infra at 16-25, that the deputies also had reason to believe that both McRae and Evans were armed with handguns.

13

United States v. Arvizu, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."); Adams v. Williams, 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.").  As the Court put it in Wardlow:

> Terry accepts the risk that officers may stop innocent people.  Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent.  The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further.

528 U.S. at 126.

The district court erroneously turned this inquiry on its head by relying on the fact that McRae's firearm possession ultimately turned out to be lawful.  But the officers did not know that McRae lawfully possessed his firearm at the time of the detention.  And it is by now well-settled law that the reasonable suspicion inquiry focuses on the information available to the officers at the time of the stop -- here, when the officers pulled their guns and ordered the four men to the ground -- not information that the officers might later discover.  United States v. Smith,

14

201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention.") (emphasis added); United States v. Cruz, 909 F.2d 422, 424 (11th Cir. 1989) ("To determine whether a stop is reasonable, we look at the totality of the circumstances as they existed at the time of the stop.") (emphasis added).

In short, the district court erred in concluding that the officers lacked reasonable suspicion sufficient to justify a Terry stop of any of the four men, even McRae. Indeed, during the course of the suppression hearing, Lewis's attorney conceded that the officers had reasonable suspicion to conduct a Terry stop of McRae and Evans. In response to the district court's question, "once they stopped these four individuals and they said, 'Do you have weapons on you,' two of them confirmed that they did have weapons. Was that at that time a basis for them to conduct a Terry stop?" Lewis's counsel replied, "As to those two individuals, yes. But not as to my client, Your Honor."

That, of course, is not the end of the inquiry. McRae was never arrested and is not a party to this case. Thus, we are obliged to answer whether it was also reasonable under the circumstances for the officers to detain the defendant Lewis as well as McRae.

15

**B.**

Again, in determining whether a <u>Terry</u> stop is justified, "the totality of the circumstances -- the whole picture -- must be taken into account." <u>Cortez</u>, 449 U.S. at 417. "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>Id.</u> at 417-18; <u>see</u> <u>Denson v. United States</u>, 574 F.3d 1318, 1341 (11th Cir. 2009); <u>United States v. Roper</u>, 702 F.2d 984, 988 (11th Cir. 1984). As a general matter, reasonable suspicion of criminal activity must attach to the particular person stopped. <u>See</u> <u>Cortez</u>, 449 U.S. at 418 ("[A]n assessment of the whole picture . . . must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.").

But, as the Supreme Court has also made crystal clear, individualized suspicion is not an absolute prerequisite for every constitutional search or seizure. <u>Samson</u>, 547 U.S. at 855 n.4. "The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." <u>Id.</u> Thus, in <u>Samson</u> the Court specifically observed that "while this Court's jurisprudence has often recognized that to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure, we have also recognized that the Fourth Amendment imposes no irreducible requirement of

16

such suspicion." Id. (citations and internal quotation marks omitted); see also

Graham v. Connor, 490 U.S. 386, 396 (1989) ("'[T]he test of reasonableness under

the Fourth Amendment is not capable of precise definition or mechanical

application,' [and therefore] its proper application requires careful attention to the

facts and circumstances of each particular case . . . .") (quoting Bell v. Wolfish,

441 U.S. 520, 559 (1979)).

We begin with this observation: under controlling law the officers could

lawfully detain McRae in order to inquire further into a possible concealed-

weapons violation. The central question then boils down to whether it was also

reasonable under the circumstances for the officers to briefly detain all four

individuals for reasons of safety, having been told by McRae and Evans that each

of them was armed (McRae carrying a weapon on his person, and Evans having

ready access to one in a nearby open trunk), but absent any particularized

reasonable suspicion concerning Lewis.

We answer that question in the affirmative. The officers faced substantial,

immediate danger when confronted with the known possession of two firearms.

Case precedent from both the Supreme Court and this Circuit has established that,

for safety reasons, officers may, in some circumstances, briefly detain individuals

about whom they have no individualized reasonable suspicion of criminal activity

17

in the course of conducting a valid <u>Terry</u> stop as to other related individuals.

Thus, in <u>Maryland v. Wilson</u>, 519 U.S. 408 (1997), the Supreme Court held that, in the context of a traffic stop,[5] an officer may order a <u>passenger</u> out of a vehicle even though the <u>driver</u> is the only person the officer reasonably suspected of committing a traffic infraction. <u>Id.</u> at 408. The relevant inquiry for reasonableness purposes "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." <u>Id.</u> at 411 (internal quotation marks omitted). The Court concluded that the "weighty" interest in officer safety was a powerful justification for the practice of ordering a passenger out of the vehicle (plainly a detention, albeit a brief one), which outweighed the more limited intrusion on the passenger. <u>Id.</u> at 412-13.

In <u>Hudson v. Hall</u>, 231 F.3d 1289 (11th Cir. 2000), a panel of this Court considered, in the qualified immunity context of a § 1983 suit, whether an officer, who conducted a traffic stop of a vehicle, lawfully searched not only the driver, but also the two passengers. One of the defendant passengers consented to the search, but only after the officer told him, "[i]f you don't want to be searched, start

---

[5] Although the instant case did not involve a traffic stop, cases involving traffic stops are nonetheless relevant in evaluating the reasonableness of investigatory detentions more generally. <u>See</u> <u>Arizona v. Johnson</u>, 555 U.S. 323, 330 (2009) ("'[M]ost traffic stops,' this Court has observed, 'resemble, in duration and atmosphere, the kind of brief detention authorized in <u>Terry</u>.'" (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 n.29 (1984)).

18

walking." Id. at 1297. That defendant argued that the statement was coercive, but we concluded on appeal that even if that were the case, the statement's "impropriety . . . [was] not plain." Id. The reason for this was that "a police officer performing his lawful duties may direct and control -- to some extent -- the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing." Id. (citing Wilson, 519 U.S. at 415). As the Supreme Court has later stated, it is "reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety." Brendlin v. California, 551 U.S. 249, 258 (2007) (emphasis added) (holding that a passenger has standing to challenge the constitutionality of a traffic stop because the passenger is also seized from the moment a vehicle is stopped).

More significantly, our decision in United States v. Clark, 337 F.3d 1282 (11th Cir. 2003), is analogous to the instant case. Clark also involved a brief detention of an individual in the absence of any particularized, reasonable suspicion of criminal activity. An Atlanta police officer was patrolling alone in a high crime area at night. Id. at 1283. He saw two men wrestling and fighting in the middle of the street. Id. Nearby, an automobile was parked on the wrong side of the street with its lights on, a door open, and the engine running. Id. A third

19

person, the defendant, was watching the fight from the sidewalk. Id. The officer broke up the fight, confirmed that the vehicle belonged to one of the two fighters, and ordered everyone (including the defendant) into the car while he called for backup and investigated further. Id. The defendant had informed the officer prior to the detention that he had been a passenger in the vehicle and was associated with the two men. Id. The officer testified that he ordered the defendant "to reenter the vehicle because he was 'part of the scene.'" Id.

After the defendant was detained by the officer who ordered him into the car, the events that followed led to the discovery of a handgun in the car and the subsequent arrest of the defendant. Id. The officer's backup arrived on the scene and saw the defendant "fumbling around under the seat." Id. The defendant was ordered to put his hands on the dashboard, and when one of the officers opened the passenger door to remove the defendant from the vehicle, a .40 caliber handgun fell onto the street. Id. The defendant was then arrested.

On appeal, a panel of this Court concluded that the brief detention of the defendant (against whom there was no particularized suspicion and who was simply standing on the sidewalk when the officer encountered him) was lawful and reasonable under the circumstances in order to protect the officer's safety "while he conducted an investigation of reasonably suspicious violent conduct that

20

occurred in his presence." Id. at 1285. Notwithstanding the fact that the officers never stopped any vehicle, we found the case analogous to the earlier cases of Wilson and Hudson, id. at 1286-87, concluding that, under the circumstances, the officer could briefly detain the defendant by ordering him into the vehicle in order to control the situation, even absent any individualized suspicion, essentially for the same reasons that the officer in Wilson could order the defendant passenger out of the vehicle, id. at 1285, 1288. Moreover, we stressed that "the 'risk of harm' to officers is 'minimized' when police officers 'exercise unquestioned command of the situation.'" Id. at 1288 (quoting Michigan v. Summers, 452 U.S. 692, 702-03 (1981)). Indeed, citing our earlier decision in Hudson, we observed that the prior panel "reasoned that an officer may 'control' persons not suspected of wrongdoing if they are near a street encounter with persons reasonably suspected of criminal activity." Id. We also emphasized that the encounter took place in a high crime area at night and that the defendant was associated with the individuals about whom the officers had reasonable suspicion. Id.

The brief detention of Lewis in this case served exactly the same safety purposes discussed in Clark and in the traffic stop cases of Wilson and Hudson -- to control the movements of nearby associates and exercise command over the situation once the officers had reasonable suspicion of criminal activity that

21

warranted further investigation. Once the officers had that reasonable suspicion, they were not obliged to let three of the four associated individuals walk about freely while they investigated McRae, in light of the officers' powerful concern for their own safety. Clark, 337 F.3d at 1288.[6]

The reasonableness of the officers' conduct under the totality of the circumstances was heightened greatly by the admitted presence of two firearms, which posed a serious risk to the safety of the officers as well as the other individuals present in the crowded parking lot.[7] See Florida v. J.L., 529 U.S. 266,

---

[6] This conclusion is consonant with Terry and its progeny. Courts applying Terry have long-determined that officers may take a number of actions to increase their safety and minimize the risk of harm when they are conducting lawful searches and seizures. Thus, for example, the Supreme Court has held that officers executing a search warrant may lawfully detain the occupants of the premises, Summers, 452 U.S. at 704-05, and that an officer making an in-home arrest may conduct a limited protective sweep of the premises when the officer "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene," Maryland v. Buie, 494 U.S. 325, 337 (1990); United States v. Caraballo, 595 F.3d 1214, 1224 (11th Cir. 2010).

[7] Both officers specifically testified about the serious danger posed by the presence of at least two firearms. Deputy Bojko was asked at the suppression hearing why the officers drew their weapons and briefly detained all four individuals:

Q. Okay. Why did you issue the order?
A. I needed to get the subjects under control, especially since firearms were involved for my safety and the safety of my field training officer.

Deputy Stiles amplified the nature of the danger posed in these words:

Q. Why do you ask the question [whether the individuals had any weapons on them]?
A. To find out if they do, because I'm worried about my safety and other officer safety.

22

272 (2000) ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions.  Our decisions recognize the serious threat that armed criminals pose to public safety; Terry's rule, which permits protective police searches on the basis of reasonable suspicion . . . responds to this very concern.") (citing Terry, 392 U.S. at 30); Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977) (per curiam) (observing that armed suspects "pose[] a serious and present danger to the safety of the officer"); United States v. Gibson, 64 F.3d 617, 624 (11th Cir. 1995) ("Law enforcement officers are at greatest risk when dealing with potentially armed individuals because they are the first to confront this perilous and unpredictable situation.").  McRae had a firearm on his person, and Evans

---

Q.  Did they have guns on them or weapons?
A.  Yes ma'am.  Two of them said they were armed.
Q.  Specifically, what was said?
A.  One said, "I have on in my waistband," and the other one said, "I got one in the trunk."
Q.  Did this concern you?
A.  Absolutely.
Q.  Why?
A.  Because I don't want to get in a gun fight.  I don't want to get shot.  I don't want my partner to get shot.
Q.  And how many deputies were there at this point?
A.  Two.
Q.  And how many individuals were there?
A.  Four.
Q.  Did that ratio concern you in any way?
A.  Yes, ma'am.
Q.  Why?
A.  Because we could be outgunned.  There could be four guns there to our two.

23

indicated that there was another handgun in the nearby open car trunk, well within the reach of all four individuals at the time the officers drew their weapons. Indeed, the known presence of firearms made the reasonableness of the brief detention in this case even more compelling than in Clark, where the officer simply saw two individuals wrestling in the street and had no reason to believe that there were any firearms or other weapons present at the scene, let alone a firearm in a backpack in an open trunk right near where all of the individuals were standing.[8]

As the Supreme Court emphasized in Terry itself, a brief stop-and-frisk is permissible, even absent probable cause to arrest, "for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." 392 U.S. at 27 (emphasis added). In fact, the very

---

[8] Our dissenting colleague suggests that the officers were limited on these facts to stopping and patting down only McRae and Evans to ensure their safety. The other two individuals apparently would have been free to mill about, walk away, or perhaps even grab the firearm from the open trunk of a nearby vehicle as the officers briefly investigated possible concealed weapons violations. The only other alternative available to the officers would have been simply to shrug their shoulders and walk away from further inquiry into possible serious violations of Florida law. This they were not obliged to do. See Adams, 407 U.S. at 145. Mindful of the important and often difficult balance between the public interest and the individual's right "to personal security free from arbitrary interference," we are satisfied that the "weighty" interest in officer safety was a powerful justification for briefly detaining all four individuals. Wilson, 519 U.S. at 411-12 (internal quotation marks omitted). Under the peculiar circumstances of this case, as we see it, the officers' split-second decision to briefly detain the defendant as well was altogether reasonable and fully consonant with the command of the Fourth Amendment.

rationale underpinning Terry -- the protection of officer safety and the safety of others nearby, especially from the dangers posed by firearms -- is presented by the facts of this case. We add that the detention took place at night in a high crime area, which, while surely not dispositive, is still another relevant consideration in the Terry calculus. See Wardlow, 528 U.S. at 124; United States v. Gordon, 231 F.3d 750, 755-56 (11th Cir. 2000). And we further emphasize that, as in Clark, the defendant here was not some "unrelated bystander," Clark, 337 F.3d at 1288, but rather "an associate of [the] persons being investigated for criminal activities," id.

In short, under the totality of the circumstances of this case, the officers were entitled to control the scene and exercise command over the situation in the course of briefly detaining McRae for further investigation. A brief detention of all four associated individuals was reasonable, in light of the substantial risks to the officers' safety. Accordingly, we REVERSE the district court's order granting Lewis's motion to suppress, and REMAND for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

WILSON, Circuit Judge, dissenting:

I agree with the majority that the district court erroneously considered information unavailable to the officers at the time of the stop at issue. Furthermore, I do not dispute that the officers had reasonable suspicion to detain McRae to investigate whether he illegally possessed a concealed weapon in violation of Florida law. I do not, however, join the majority in finding that the stop of Lewis was proper.

For purposes of the Fourth Amendment, we proceed against the background that "[a] search or seizure is ordinarily unreasonable in the absence of *individualized* suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (emphasis added). Consistent with this general requirement, the Supreme Court has "recognized only limited circumstances in which the usual rule does not apply." *Id.* Those exceptions are justified for situations in which the public interest outweighs "'the individual's right to personal security free from arbitrary interference by law officers.'" *Maryland v. Wilson*, 519 U.S. 408, 411 (1997) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam)). However, none of those exceptions apply here,[1] and the "reasonableness" inquiry

---

[1] For example, the Court has approved of suspicionless seizures in the context of certain police checkpoints, *see, e.g.*, *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 453–55 (1990); *United States v. Martinez-Fuerte*, 428 U.S. 543, 566–67 (1976), but those cases have rightfully

does not justify ignoring the reasonable suspicion requirement in situations where officers claim a generalized concern for safety.[2]

Although the majority holds that this stop was reasonable under the circumstances, it does so without meaningfully balancing the competing public and private interests at issue. In ignoring this balance, the majority has essentially found that a broad assertion of officer safety necessarily trumps the private right of individual liberty and therefore justifies a warrantless stop. I emphasize that I fully appreciate the high value we place on officer safety, which typically leads us to defer to an experienced officer's judgment about how to control the scene of an investigation. However, I am not aware of any court that has held that concerns for officer safety justify *every* intrusion on individual liberty. *See Edmond*, 531 U.S. at 42 ("[T]he gravity of the threat alone cannot be dispositive of questions

not been proffered as an appropriate parallel to the detention at issue here.

[2] The district court conducted an extensive evidentiary hearing and considered "all relevant findings" and "evidence of record" in its order suppressing the firearm. Dist. Ct. Order at 1. These considerations certainly included the officers' testimony regarding the threat they perceived based on the behavior of the four men. Notably, though, the district court did not find any fact to substantiate the officers' "hunch," *see Terry v. Ohio*, 392 U.S. 1, 27 (1968), that Lewis could also be carrying a firearm and therefore present a "substantial, immediate danger" to their safety. Given our obligation to review the facts and testimony in the light most favorable to Lewis, *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000), we would not ordinarily credit the officers' testimony in a manner inconsistent with the district court's order, *see United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (noting that, even in the absence of "detailed findings of fact," we credit the lower court's credibility determinations that are implicit in its ruling).

concerning what means law enforcement officers may employ to pursue a given purpose.").

To the contrary, Lewis had a weighty interest in his own personal liberty at the time of the stop equivalent to that of any other individual detained in an on-the-street encounter under *Terry*. And we have recognized that the Supreme Court long ago established the appropriate balance between the public and private interests that permits a stop in this context: the existence of reasonable suspicion based on "specific and articulable facts." *See United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) ("In justifying [a *Terry* stop], the 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968))). I do not find that reasonable suspicion justified Lewis's detention.

I

In lieu of conducting its own balance of the interests, the majority mistakenly analogizes the stop of Lewis to the limited control that an officer can exercise over the passenger of a vehicle whose driver is under investigation for illegal activity. In the cases cited by the majority, the prolonged detentions were deemed reasonable because of the preexisting restriction on the passenger's

28

liberty.  I do not read the combination of *Wilson*, *Hudson*, and *Clark* to establish a broad officer-safety exception to the requirement of reasonable suspicion; I understand these cases to support a common-sense principle that, because a vehicle's passengers are seized once their driver has been detained—that is, they have no real alternative but to await the conclusion of the investigation—an officer's direction of their movement is not sufficiently burdensome to violate the passengers' Fourth Amendment rights.  *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ("For the duration of a traffic stop, . . . a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers." (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007))).

In *Maryland v. Wilson*, the Court found it reasonable for an officer to order a passenger out of a stopped vehicle, even when no reasonable suspicion existed that the passenger was involved in any unlawful conduct.  *See* 519 U.S. at 414–15. This holding was based on the reality that the passengers were already detained "by virtue of the stop of the vehicle."  *Id.* at 414.  In evaluating reasonableness, the Court explained that the additional intrusion on the passenger in light of this preexisting detention was "minimal" and, therefore, outweighed by the government's heavy interest in the safety of its officers.  *Id.* at 413, 415.  In other words, because the detention of the vehicle prevented the passenger from leaving,

29

it was reasonable to direct the passenger to a location where he would not pose a risk to the officer during the ensuing investigation.

Similarly, in *Hudson v. Hall*, 231 F.3d 1289 (11th Cir. 2000), we analyzed the appropriateness of an officer's behavior in directing car passengers after a valid underlying vehicle stop. There, we seized upon *Wilson* to explain that "a police officer performing his lawful duties may direct and control—to some extent—the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing." *Id.* at 1297. Again, the officer in *Hudson* exerted control of the situation only *after* the vehicle had been pulled over, thereby detaining the driver and all passengers. *See id.* at 1295–96. Thus, like in *Wilson*, any additional intrusion on Hudson was negligible in light of the preexisting, justified detainment of the vehicle and its passengers. And, in *Hudson*, the officer actually offered to allow the passenger to walk away from the scene, *id.* at 1292, which is precisely what Lewis was prevented from doing here.

For similar reasons, the majority's analogy to *United States v. Clark*, 337 F.3d 1282 (11th Cir. 2003), is misplaced. The issue confronted in *Clark* was "whether a law-enforcement officer may briefly detain and order a passenger to reenter an automobile to protect the officer's safety while the officer investigates a

crime committed in his presence by two associates of the passenger." *Id.* at 1282.[3]

Essentially, the court faced *Wilson* in reverse, as the officer ordered a car's occupants to re-enter (rather than exit) the vehicle pending investigation of the driver's observed illegal conduct. *Id.* at 1283. Here again, when the officer seized the vehicle's driver, Clark was temporarily incapable of leaving that specific situation by reason of investigation of the driver. Consistent with *Wilson* and *Hudson*, the officer could reasonably direct Clark back inside the car because the intrusion on his personal liberty was minimal—he admittedly arrived in that vehicle and would presumably be leaving in it as well. *See id.* (recalling the fact that the officer directed Clark's movement only after being advised that Clark had been a passenger in the vehicle).

Also significant in *Clark* was the credible threat of violence facing the officer, which bore on the reasonableness of the detainment. The officer in *Clark* approached a situation in which he plainly observed violence and other illegal activity. *Id.* at 1287 (noting the totality of the circumstances, which included

---

[3] Likewise, the analysis of controlling law in *Clark* focused on vehicle-detention cases and did not ever imply that the officers conducted a *Terry* stop, which is at issue here. The majority highlights the Supreme Court's comment in *Berkemer v. McCarty* that "most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*." 468 U.S. 420, 439 n.29 (1984). But to say that *Terry* principles instruct a vehicle stop is not to imply the converse. The vehicle-seizure cases are premised on a de minimis interest in the passenger's personal liberty, and no part of a typical *Terry* stop serves to similarly minimize an individual's interest in being free from arbitrary interference by law enforcement.

31

observation of a physical confrontation and an illegally parked car on the street).

And he confronted this violent situation alone. *Id.* Far from that scenario, the two

officers who stopped Lewis here could not identify any behavior to suggest that

*any* of the four men ultimately detained were committing any violent crimes or

planned to do anything but cooperate.

In sum, the intrusion on Lewis's personal liberty far exceeded the de

minimis detention held reasonable in *Wilson*, *Hudson*, and *Clark*. Because Lewis

was not "already stopped" as a result of the consensual encounter with police, *see*

*Wilson*, 519 U.S. at 414, this court is obligated to analyze whether reasonable

suspicion justified detention of Lewis, *see Tapia*, 912 F.2d at 1370.

## II

In an "on-the-street encounter," a *Terry* stop is lawful "when the police

officer reasonably suspects that *the person apprehended* is committing or has

committed a criminal offense." *Johnson*, 555 U.S. at 326 (emphasis added).

Florida law does not appear to criminalize the act of standing in close proximity to

an individual who carries a concealed weapon.[4] The proper inquiry thus becomes

---

[4] "Further, pursuant to the Second Amendment of the United States Constitution, it is not per se unlawful to possess a firearm, nor is it illegal to admit to carrying a firearm. Additionally, in the State of Florida, pursuant to Fla. Stat. § 790.01(2), it is not illegal for a person to carry a concealed weapon, provided he is also in possession of a valid state issued carrying permit, as was the case with Mr. McRae." Dist. Ct. Order at 8.

whether reasonable suspicion that one individual in a group unlawfully possesses a concealed weapon can be imputed to another member of the group who has exercised his right not to engage police in a consensual encounter. My sense is that it cannot.

As the majority recounts, the officers approached Lewis and his three companions and engaged them in a valid, consensual encounter. *See United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 356 (2011). At that point, Lewis and the others could have ignored the police entirely and continued conducting their lawful business in the parking lot.[5] *See Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (plurality opinion). The only intervening fact between the consensual encounter and the stop of Lewis was the voluntary, affirmative responses of Evans and McRae when asked whether any person in the group possessed a firearm. The suspected possession offenses on behalf of other persons, however, did not implicate Lewis in the commission of any crime, and it therefore could not serve as a basis to draw weapons on the entire group otherwise lawfully present in the parking lot.

---

[5] As the district court stated in its suppression order, testimony at the evidentiary hearing established that "the men were just standing in the Seawinds restaurant parking lot and that there was no basis for the officers to conclude that the men were involved in the commission of a robbery, drug dealing, or any other crime." Dist. Ct. Order at 3.

We have previously held that illegal activity combined with suspicion that a suspect carries a concealed weapon provides reasonable suspicion to justify a *Terry* stop to search for weapons. *See United States v. Hunter*, 291 F.3d 1302, 1307 (11th Cir. 2002). We have similarly held that "[a] person's proximity to a person whom officers have *probable cause* to believe is committing a crime may be considered as a factor in assessing reasonable suspicion." *United States v. Gonzalez*, 70 F.3d 1236, 1238 (11th Cir. 1995) (per curiam) (emphasis added).[6] We have never, though, extended this reasoning to impute an officer's reasonable suspicion of one individual to an associate who is in the vicinity and engaged in purely lawful activity. *See United States v. Afandor*, 567 F.2d 1325, 1331 (5th Cir. 1978) ("Lest there be any doubt, we state here that 'reasonable suspicion' must be specifically directed to the person to be searched. . . . [T]he [F]ourth [A]mendment does not permit any automatic or casual transference of 'suspicion.'"). And there is good reason for this court not to do so, as the piggybacking of reasonable suspicion, especially in a circumstance where the possible offense is of singular possession, is too attenuated to pass muster under the Fourth Amendment. *See United States v. Lindsey*, 482 F.3d 1285, 1290 (11th

---

[6] This reasoning is also consistent with the vehicular-seizure cases, where detention of the driver renders the detention of the vehicle's occupants reasonable. *See Wilson*, 519 U.S. at 413–14; *Hudson*, 231 F.3d at 1295–97; *Clark*, 337 F.3d at 1288.

34

Cir. 2007) ("'[R]easonable suspicion' must be more than 'an inchoate and unparticularized suspicion or hunch.'" (quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000))).

As the district court explained, "the deputies specifically testified that they did not have any evidence that [Lewis] had participated in a robbery or had been selling drugs or was in any other way engaged in or about to be engaged in the commission of a crime." Dist. Ct. Order at 10. The only "specific and articulable" facts the Government offers to establish reasonable suspicion involve Lewis's conduct *after* the police officers had effectuated the stop. The district court found that *after* the police drew their guns, Lewis was nervously looking about.[7] Furtive behavior occurring *after* the stop, however, cannot retroactively justify the stop for which the officers otherwise had no indicia of illegal activity. *See United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989) (per curiam) (explaining that we consider the "totality of the circumstances as they existed at the time of the stop").

Based on the circumstances, precedent provides that the appropriate scope

---

[7] The district court found the following as part of the totality of the circumstances at the time of the stop: "standing by a car; looking in the trunk of a car; talking to each other in association; standing in a parking lot of a restaurant while it was open for business; [and] failing to park their cars in designated parking spaces in a crowded private parking lot." Dist. Ct. Order at 8. Although the district court improperly considered that the two individuals possessing firearms did so lawfully, that circumstance was wholly inapplicable to Lewis, who never volunteered to the officers that he possessed a weapon.

35

of the detention here would have been a pat down of the armed individuals to ensure the safety of the officers. *See Hunter*, 291 F.3d at 1307 ("An officer who has a reasonable suspicion that an individual is engaged in illegal activity and is armed with a concealed weapon *is justified in conducting a limited search for weapons*." (emphasis added)).[8] The officers would likewise act reasonably if they were to ask the two men not suspected of any illegal activity to walk a safe distance away from the scene. *See Hudson*, 231 F.3d at 1292. And any escalation of the situation would justify appropriate measures to respond to evolving circumstances. However, the response here, in light of the actual facts and not a scenario the majority conceives, exceeded the valid scope of a stop under *Terry*, which permits an officer "for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of" persons deemed "armed and presently dangerous" in order to "discover weapons which might be

---

[8] To undermine this well-settled legal principle, the majority, in footnote 8, divines an entirely new scenario—one far removed from the situation presented "on these facts"—where Lewis could wander about the scene of the investigation, grabbing at firearms and potentially assaulting police officers. I have neither stated nor implied that the scope of detention under *Terry* immunizes Lewis from all police interference for the entire duration of the investigation regardless of his behavior, and I respectfully disagree with the majority's characterization of this point. I simply recognize that based on precedent, *Terry* does not permit the stop of an individual for whom the officers cannot articulate reasonable suspicion of wrongdoing. Adding the circumstances proposed by the majority leads to a result based on possibilities rather than the "totality of the circumstances *as they existed at the time of the stop*." *Cruz*, 909 F.2d at 424 (emphasis added).

used to assault him." 392 U.S. at 30. No case law from this circuit has interpreted *Terry* to permit more intrusive detentions than a pat down for weapons of those reasonably suspected of criminal activity, and the majority's unsupported criticism of this established principle contravenes precedent without explanation.

As a result of the foregoing, I do not find the broad "reasonableness" standard, or the cases cited by the majority, to be instructive to the proper resolution of this case. Nor can I identify any "specific and articulable facts" that would give rise to the inference that Lewis was engaged in criminal activity. Because the officers had no legal justification for their course of behavior, I would affirm the district court's order suppressing the firearm at issue here.