[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13342
Non-Argument Calendar

_____

D.C. Docket No. 5:18-cr-00058-TES-CHW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

KELVIN BYRON,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 4, 2020)

Before JORDAN, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

In this interlocutory appeal, the government challenges the district court's

grant of a motion to suppress evidence from a traffic stop in a prosecution for

possession with intent to distribute cocaine and cocaine base, in violation of 21

U.S.C. § 841(a)(1).  The district court determined that the deputy who conducted the

traffic stop lacked reasonable suspicion to prolong it in order to ask questions

unrelated to the purpose of the stop, thereby tainting Byron's consent to search.

After careful review, we affirm.

## I.

At around 11:30 p.m. on a warm night in September 2017, Deputy Brandon

McGaha of the Butts County Sheriff's Office was patrolling Interstate 75 in Georgia,

when he observed a black Lincoln MKZ following another vehicle too closely.

McGaha decided to initiate a traffic stop and turned on his overhead blue lights,

which activated the dashboard camera of his patrol car.

After McGaha activated his lights, it took Byron, the Lincoln's driver,

approximately one minute and twenty-two seconds to come to a complete stop on

the shoulder of the road.  Driving in the center lane of a three-lane highway, Byron

braked and slowly transitioned to the right lane, and then started moving onto the

shoulder.  But as the car was about halfway onto the shoulder, Byron returned to the

right lane for approximately seven seconds.  He then moved back onto the shoulder

fully and continued along for roughly twenty seconds before coming to a complete

stop.  According to McGaha, Byron's reluctance to stop indicated that he was

"contemplating fleeing."

2

McGaha got out of his patrol car, approached the Lincoln's passenger side window, and requested Byron's license. At this time, according to McGaha, Byron was "sweating from his forehead," and "his hand was trembling when he handed [McGaha] his license." McGaha then asked Byron, the Lincoln's sole occupant, to exit the car. Once Byron did so, leaving the driver's door open, McGaha frisked him but found no weapon. McGaha explained that he stopped Byron for following another motorist too closely and that he was going to issue Byron a warning. Byron told McGaha that "he was stacked up behind another vehicle" because only one lane was open due to road construction. McGaha advised that all lanes were open when he observed Byron following too closely.

While Byron remained in front of the patrol car and spoke on his cell phone, McGaha went to the passenger side of the patrol car and retrieved a warning citation form and clipboard. McGaha began filling out the warning citation and then asked Byron a question. Byron ended the phone call and responded. McGaha asked if Byron had an insurance card, and Byron turned and started to walk back to his car. Worried that he "might flee," McGaha testified, McGaha asked him to stop, and he complied.

Over the next couple minutes, McGaha continued to fill out the warning citation while periodically stopping to ask Byron questions about where he had been traveling, whether he had any luggage, weapons, or illegal items in the car, and

3

whether anybody else drove the car besides Byron.  Byron responded in part that he did not have any luggage, weapons, or illegal items in the car.  When asked about luggage, Byron offered to open the trunk and turned towards the car, but McGaha again stopped him.  McGaha testified that Byron's sweating "began to get worse and worse and worse as we were talking."  He also described Byron's demeanor as "very animated," stating that he was "[m]oving a lot," "[c]ouldn't stand still," and was "[t]alking with his hands."

After these questions, McGaha asked Byron for permission to search the car, and Byron consented.  Meanwhile, McGaha called for backup and continued to fill out the warning citation.  A few minutes later, apparently seeing a backup patrol car arriving, Byron ran to and reentered his car.  McGaha followed, leading to an altercation.  Eventually, Byron was arrested and his car was searched.  The search revealed "a large Saran Wrap package containing suspected cocaine."

Following his indictment for possession with intent to distribute cocaine and cocaine base, Byron moved to suppress evidence from the traffic stop.  He argued that McGaha impermissibly extended the traffic stop in violation of his Fourth Amendment rights, thereby tainting his consent to search, by asking questions unrelated to the purpose of the stop without reasonable suspicion of criminal activity.

The district court held a hearing and then granted the motion to suppress. The court found that McGaha "both prolonged the stop and lacked reasonable suspicion

4

to do so," and that the unlawful extension of the stop tainted Byron's consent to search. The government appeals. We have jurisdiction under 18 U.S.C. § 3731.

## II.

Motions to suppress evidence present mixed questions of law and fact. *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010). We review the district court's factual findings for clear error and its application of law to those facts *de novo*. *Id.* *United States v. Knight*, 562 F.3d 1314, 1322 (11th Cir. 2009). "[A]ll facts are construed in the light most favorable to the prevailing party below," and "we afford substantial deference to the factfinder's credibility determinations, both explicit and implicit." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (quotation marks omitted).

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Like a *Terry*[1] stop, "the scope of the stop must be carefully tailored to its underlying justification." *United States v. Campbell*, 912 F.3d 1340, 1350 (11th Cir. 2019). As a result, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted). The stop may not last longer than necessary to complete that mission. *Id.* "Authority

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

5

for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

An officer is not prohibited altogether from conducting inquiries unrelated to the purposes of the stop—that is, inquiries directed at detecting criminal activity more generally. *See id.* at 355 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop."). But the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Absent reasonable suspicion, any prolongation of the stop for unrelated investigation is unlawful. *Id.* at 357.

In sum, "a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." *Campbell*, 912 F.3d at 1353. "That is, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." *Id.*

The district court found, and the government does not dispute, that Deputy McGaha conducted unrelated inquiries aimed at investigating other crimes—asking Byron whether he had any luggage, weapons, or illegal items in the car, and whether anybody else drove the car besides Byron—and that these inquiries added time to the stop. Thus, the sole question before us is whether McGaha had reasonable suspicion to conduct these unrelated inquiries.

6

An officer can detain a motorist for a brief investigation when the officer has a "reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000).  Reasonable suspicion is a less demanding standard than probable cause and requires only a "minimal level of objective justification." *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004).  Nevertheless, "[t]he reasonable suspicion must be more than an inchoate and unparticularized suspicion or hunch." *Powell*, 222 F.3d at 917 (quotation marks omitted).

In making reasonable-suspicion determinations, we "must look at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).  Moreover, "a police officer's subjective motivations for conducting a stop have no bearing on the objective inquiry into whether the stop is reasonable under the Fourth Amendment." *Lewis*, 674 F.3d at 1304 n.3.

When we view the totality of the circumstances, we cannot simply disregard factors that may have an innocent explanation. *Arvizu*, 534 U.S. at 274–75. Reasonable suspicion may exist even if each fact alone is susceptible of innocent explanation. *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009). After all, reasonable-suspicion analysis is not concerned with hard certainties but

7

with probabilities, and officers may rely on inferences and deductions "that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981). In this way, the Fourth Amendment "accepts the risk that officers may stop innocent people." *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000).

The government makes two arguments on appeal. First, the government contends that the district court legally erred both by focusing exclusively on McGaha's *subjective* suspicions, rather than assessing whether the totality of the circumstances provided an *objective* basis for suspecting criminal activity, and by requiring McGaha to have reasonable suspicion of a particular crime. Second, the government maintains that, when the totality of the circumstances is viewed objectively, reasonable suspicion existed to prolong the traffic stop. We address each argument in turn.

### A.

We are not convinced that the district court applied an incorrect legal framework. Because Deputy McGaha was the only person who testified at the suppression hearing, it's inevitable that his observations and explanations would be central to the suppression order. To be sure, in parts of the order the court appears to have directly analyzed McGaha's subjective motivations. *See, e.g.*, Doc. 33 at 12 (stating that McGaha's questions were "not particularly illuminating with regard to the deputy's suspicions"). And we agree that McGaha's "subjective motivations for

8

conducting [the] stop have no bearing on the objective inquiry into whether the stop is reasonable under the Fourth Amendment. *Lewis*, 674 F.3d at 1304 n.3.

But even if we assume that the suppression order reasonably may be construed as the government asserts, that's not enough to demonstrate error. "Trial judges are presumed to know the law and to apply it in making their decisions." *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1395 (11th Cir. 1997) (quotation marks omitted). And "[o]nly if no reasonable construction of what the district court wrote can support a lawful judgment, will we find error." *Id.*

Here, a reasonable construction of the order supports the decision. The court first recounted all facts relevant to the totality of the circumstances. It then correctly cited *Terry* and other relevant law and explained that reasonable suspicion was determined based on the totality of the circumstances and that it required some "minimal, objective justification." Finally, the court concluded that "Deputy McGaha unlawfully prolonged the traffic stop in violation of Defendant's Fourth Amendment rights" because he "lacked reasonable suspicion to do so." Despite some ambiguous remarks in the order, it's reasonable to infer that the court applied the correct standard in reaching that conclusion.

**B.**

Having concluded that the district court applied the correct legal standard, we turn to the question of whether reasonable suspicion justified extending the traffic

9

stop. We review that issue *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). In doing so, however, we view the facts in the light most favorable to Byron, the prevailing party below, and we defer to the court's factual findings and credibility determinations, both explicit and implicit. *Lewis*, 674 F.3d at 1303; *see United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) (*en banc*) ("[W]e and other federal appellate courts have inferred from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated.").

The government maintains that the following factors all suggested that Byron was engaged in other illegal activity: "Byron's failure to promptly pull over when signaled, abnormal conduct in pulling over, false explanation for committing the traffic violation, attempt to return to his car during the traffic stop, and nervous demeanor and behavior that persisted throughout the course of the stop." Construing the record in the light most favorable to Byron as the prevailing party in the district court, however, we find that the totality of the circumstances cannot support a legitimate inference of further illegal activity that rises to the level of objective, reasonable suspicion. *See Lewis*, 674 F.3d at 1303.

The government argues that Byron's "extremely nervous" behavior throughout the stop, evidenced by his trembling hands, visible sweat on his forehead, and his "animated" movements, contributed to McGaha's reasonable suspicion.

10

[Blue Br. at 20.]  While nervousness is "a pertinent factor in determining reasonable suspicion," *Wardlow*, 528 U.S. at 124, we have recognized that some level of nervousness is to be expected from a motorist as a result of "being momentarily detained by an authority figure with police power over him," *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003).  After listening to McGaha's testimony and watching video of the traffic stop, the court apparently concluded that Byron did not exhibit nervousness out of the ordinary for a motorist stopped "on a hot September night in Georgia."  Nothing in the record, including the video, shows that the court clearly erred in making that implicit finding.  *See United States v. Boyce*, 351 F.3d 1102, 1108 (11th Cir. 2003) (reviewing a district court's finding that the defendant was "unusually nervous" for clear error).

Nor do Byron's actions during the stop demonstrate eagerness to flee, such that they could contribute to a reasonable suspicion of illegal activity.  Before the unrelated questions at issue, Byron had made one movement towards his car in direct response to McGaha asking if he had an insurance card, and he stopped when prompted by McGaha.[2]  Byron's response—turning towards the car, where an insurance card would be located—was a natural and expected consequence of

---

[2] Byron turned towards his car a second time after McGaha asked if he had any luggage. But at that point, the stop had been prolonged for unrelated inquiries.  The government cannot use Byron's subsequent conduct to validate the officer's inquiries because the officer's conduct must be "justified at its inception."  *Terry*, 392 U.S. at 20.

McGaha's question, even if McGaha did not explicitly request to see the card. Byron's attempt to comply with McGaha's implicit request does not reasonably suggest criminal activity, and Byron otherwise remained facing McGaha in front of the patrol car. Moreover, as the district court noted, McGaha did not take other actions consistent with his stated concern about Byron fleeing, apart from asking Byron to step out of the car.

As for Byron's alleged false explanation for committing the traffic violation, the government fails to explain how this falsity is "indicative of some sort of criminal activity," either alone or in combination with other factors. *Boyce*, 351 F.3d at 1109; *see United States v. Bowman*, 884 F.3d 200, 216 (4th Cir. 2018) ("Even if . . . Bowman had not been truthful about the amount of time he and Alvarez had been traveling, the government failed to connect it to any wrongdoing in this case."). For instance, we have explained that "conflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these questions and because the driver may be trying to hide the fact that he is going to or coming from a known drug-source state." *Boyce*, 351 F.3d at 1109; *United States v. Hernandez*, 418 F.3d 1206, 1210–11 (11th Cir. 2005) (holding that the defendant's plainly "implausible speeding excuse," in combination with other factors, was sufficient for reasonable suspicion). Here, in contrast, simply attempting to minimize or divert blame for a traffic infraction, while not to be

12

encouraged, is largely innocuous and not infrequent, and nothing about Byron's response was obviously implausible or suggestive of an attempt to conceal illegal conduct.

We are left with only one factor that could create a reasonable suspicion of criminal activity:  Byron's failure to promptly pull over when signaled, and abnormal conduct in pulling over  We agree with the government that Byron's driving maneuvers were suspicious—particularly Byron's brief return to the road after moving halfway onto the shoulder—and that McGaha could reasonably conclude from them that Byron was reluctant to stop.  And we have recognized that "reluctance to stop" may contribute to the formation of an objectively reasonable suspicion of illegal activity.  *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)).

But we cannot say that Byron's reluctance to stop alone-provided the necessary "particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273.  Reasonable suspicion is determined from the totality of the circumstances, and Byron's conduct during the stop, viewed in the light most favorable to Byron and with deference to the district court's factual findings and credibility determinations, did not bolster or give additional meaning to whatever initial suspicion arose from Byron's reluctance to stop.  After being stopped, Byron

13

did not exhibit unusual nervousness, there were no reasonable grounds to suspect he was eager to flee, and his alleged lie was largely innocuous.

While reasonable suspicion is a less demanding standard than probable cause, an officer cannot engage in a fishing expedition based solely on a hunch that illegal activity may be afoot. *Powell*, 222 F.3d at 917 (quotation marks omitted). As McGaha testified, he could not explain what criminal activity he suspected, and he asked several broadly worded questions to "find out what might be going on." Construing the record in Byron's favor, we agree with the district court's conclusion that, viewing the circumstances objectively, McGaha was operating on nothing more than an unparticularized hunch of criminal activity that was insufficient to satisfy the Fourth Amendment. The fact that McGaha's hunch ultimately turned out to be correct "is irrelevant for purposes of the Fourth Amendment." *Perkins*, 348 F.3d at 971 (quotation marks omitted).

Finally, the government does not challenge the district court's determination that, if the stop was unlawfully prolonged, Byron's consent to search the car was tainted. We therefore affirm the district court's grant of Byron's motion to suppress evidence of the traffic stop.

**AFFIRMED.**