[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11131

_____

D.C. Docket No. 3:17-cr-00444-WKW-WC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GUILLERMO GONZALEZ-ZEA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(April 30, 2021)

Before NEWSOM and BRANCH, Circuit Judges, and RAY,* District Judge.

BRANCH, Circuit Judge:

---

\* Honorable William M. Ray, II, United States District Judge for the Northern District of Georgia, sitting by designation.

Immigration and Customs Enforcement ("ICE") agents in the process of staking out a residence in search of an ICE fugitive, whose social security number had been linked to a utility account at the address in question, stopped a car leaving the residence in the early morning hours of September 26, 2017. Guillermo Gonzalez-Zea was driving that car. ICE agents asked Gonzalez-Zea for his name and requested identification. Gonzalez-Zea produced an ID card issued in Mexico and admitted that he did not have any identification issued by the United States because he was here illegally. The officers explained that they were looking for an ICE fugitive, and Gonzalez-Zea stated that he lived alone, but he gave the officers permission to search his house. During the search of the residence, the officers discovered multiple firearms in plain view and arrested Gonzalez-Zea for possession of a firearm and live ammunition by an illegal alien in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). Gonzalez-Zea moved to suppress the evidence, and the district court denied his motion.

On appeal, Gonzalez-Zea argues that the district court should have granted his motion to suppress because: (1) the ICE officers did not have the requisite individualized reasonable suspicion to stop him; (2) the ICE officers unlawfully prolonged the stop; and (3) Gonzalez-Zea's consent to search his home was involuntary. After careful review and with the benefit of oral argument, we affirm.

2

### I.    Background

Between 5:00 and 6:00 a.m. on September 26, 2017, three ICE officers, Purdy, Skillern, and Hinkle, staked out a house in Heflin, Alabama (the "Heflin house"). The officers sought to apprehend Jose Rodolfo Alfaro-Aguilar, a Honduran national and an ICE fugitive with a warrant for his deportation.[2] ICE agents believed Alfaro-Aguilar might be at the Heflin house because a few months earlier a social security number associated with Alfaro-Aguilar had been used to connect a utility service at the Heflin house—although there was no evidence that the utility was connected in Alfaro-Aguilar's name. The ICE investigation also revealed that the same social security number was associated with another individual by the name of Jose Sanchez who had 26 aliases and who was associated with 15 possible addresses, with the Heflin address being the most recent location.[3]

During the stakeout, all three ICE officers wore ICE badges and bulletproof vests with ICE printed on the front and the back and carried holstered firearms.

---

[2] Alfaro-Aguilar did not appear at his scheduled June 2016 immigration hearing, but his counsel indicated that Alfaro-Aguilar had departed the United States. Following that hearing, the immigration judge issued an order of removal for Alfaro-Aguilar. Approximately a year later, the ICE officers received the lead in this case that the social security number used by Alfaro-Aguilar was used to connect a utility service at the Heflin house.

[3] Although Gonzalez-Zea argues that the social security number was associated with "26 other individuals," that contention is undermined by the record. The record confirms that the social security number was associated with two individuals—the fugitive Alfaro-Aguilar and Jose Sanchez. While Jose Sanchez had 26 documented aliases, he counts as only one individual.

Sometime before dawn, Officer Purdy saw a man leave the house, get into a car, and leave the residence. Unable to tell whether the driver was the fugitive Alfaro-Aguilar, Officer Skillern activated his lights and siren and pulled the car over to ascertain whether the driver was the fugitive, while another officer continued to surveil the residence.

The driver, Gonzalez-Zea, pulled over promptly. Officer Skillern asked Gonzalez-Zea for his name, which Skillern recognized "didn't match the person [they] were looking for." Officer Skillern asked Gonzalez-Zea for identification to confirm his identity, and Gonzalez-Zea gave him an identification card issued by Mexico. Officer Skillern asked Gonzalez-Zea if he had any other forms of identification, and Gonzalez-Zea said that he did not. When Officer Skillern asked "why he wasn't able to have an Alabama driver's license or any other United States issued ID," Gonzalez-Zea stated that he was in the country illegally. This colloquy occurred about a minute into the encounter.

At that point, Officer Skillern was "pretty positive" that Gonzalez-Zea was not the fugitive he was looking for, and he explained to Gonzalez-Zea that the officers were seeking a fugitive and asked whether anyone else lived in the house. Gonzalez-Zea stated that he lived there alone, but he granted the officers permission to go inside and "take a look" around. According to Officer Skillern, Gonzalez-Zea "didn't have any objection at all" when asked for his consent and

4

their conversation was "friendly" and "cordial." The record confirms that none of the officers drew their weapons during their encounter with Gonzalez-Zea, he was not patted down or searched, and he was not handcuffed. The officers did not read him his *Miranda* rights at this time, or tell him that he had a right to refuse to consent, or that he was free to go.

Gonzalez-Zea drove his own car back to the house, and the officers followed in their cars. Gonzalez-Zea unlocked the door to the house and entered the house with the officers. As the officers walked around, they asked Gonzalez-Zea questions about his living arrangements—whether anyone else lived there with him, how many rooms there were, and which room was his. Once the officers entered Gonzalez-Zea's bedroom, they saw two guns in plain view: a shotgun in the corner and a rifle in an open closet. Officer Hinkle then read Gonzalez-Zea his *Miranda* rights. After being read his rights, Gonzalez-Zea indicated he was willing to answer the officers' questions, and when asked if there were other weapons in the home, he showed officers where another firearm was located in a drawer.

Gonzalez-Zea was charged with one count of possession of a firearm and live ammunition by an illegal alien under 18 U.S.C. §§ 922(g)(5)[4] and 924(a)(2).[5] He moved to suppress the evidence, alleging that it was recovered after "an unlawful traffic stop and unreasonable detention" and that his consent to search was not voluntary. After an evidentiary hearing, the magistrate judge issued a Report and Recommendation ("R&R") recommending that the district court deny the motion to suppress. The district court adopted the R&R over Gonzalez-Zea's objections.

The district court found that the officers had reasonable suspicion to "believe the man they saw leaving the house [Gonzalez-Zea]. . . was the fugitive" they were seeking. Thus, "[t]hey were therefore permitted to stop and identify him." The district court also found that the officers did not unreasonably extend the stop because they did not "detour from their search for [the fugitive]," and all their questions related to whether Gonzalez-Zea was the fugitive or whether the fugitive lived in the house. Finally, the district court found that, based on the totality of the

---

[4] Section 922(g) provides in relevant part that: "It shall be unlawful[] for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5)(A).

[5] Section 924(a)(2) provides that "[w]hoever knowingly violates [18 U.SC. § 922(g)] shall be fined as provided in this title, imprisoned not more than 10 years, or both."

circumstances, Gonzalez-Zea's consent to search the house was voluntary. Gonzalez-Zea appealed.

## II.    Standard of Review

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error and its application of the law to the facts *de novo*." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (quotation omitted). We construe the facts in the light most favorable to the party that prevailed below, here, the government. *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000).

## III.    Discussion

### A.    Whether the officers had reasonable suspicion to stop Gonzalez-Zea

Gonzalez-Zea argues that the officers did not have the requisite individualized, reasonable suspicion necessary to conduct an investigatory stop. Specifically, he argues that he did not commit any traffic violation, and the officers' decision to stop any vehicle that left the residence under surveillance to determine if the driver was the fugitive that they were searching for is not the sort of particularized, reasonable suspicion required by the Fourth Amendment.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Evidence obtained in violation of the Fourth Amendment must be suppressed." *Jordan*, 635 F.3d at 1185. Whether a search or seizure is

7

reasonable "depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

The Fourth Amendment does not prohibit a police officer, "in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"—these brief investigative detentions are commonly referred to as "*Terry* stop[s]." *See Terry v. Ohio*, 392 U.S. 1, 22 (1968). *Terry* and its progeny allow an officer to, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Such investigatory stops are also authorized based on a reasonable suspicion of past criminal activity, including where an officer has "a reasonable suspicion, grounded in specific and articulable facts, that a person [the officer] encounter[s] was involved in or is wanted in connection with [another crime]." *United States v. Hensley*, 469 U.S. 221, 229 (1985) (upholding a brief *Terry* stop of a person believed to be the individual on a police-issued wanted flyer "to check identification, . . . to pose questions to the person, or to detain the person briefly while attempting to obtain further information"); *United States v. Kapperman*, 764 F.2d 786, 792 (11th Cir. 1985) (holding that a *Terry* stop of a vehicle was

8

supported by reasonable suspicion where officers had an objective reason to believe that there may have been a fugitive inside the vehicle).

In *Terry*, the Supreme Court adopted "a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (citing *Terry*, 392 U.S. at 20). Under *Terry*'s two-part inquiry, we first examine "whether the officer's action was justified at its inception," which turns on whether the officers had a reasonable suspicion that the defendant had engaged in, was engaging in, or was about to engage in, a crime. *Terry*, 392 U.S. at 20. In the second part of the inquiry, we consider "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*; *see also Jordan* 635 F.3d at 1186.

Reasonable suspicion "is not concerned with 'hard certainties, but with probabilities.'" *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). To show that an officer has reasonable suspicion, the officer "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" *Wardlow*, 528 U.S. at 123 (quoting *Terry*, 392 U.S. at 27). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.*

9

Reasonable suspicion may "be based on commonsense judgments and inferences about human behavior." *Id.* at 125. "[W]e look to the totality of the circumstances to determine the existence of reasonable suspicion." *Jordan*, 635 F.3d at 1186.

Here, construing the facts in the light most favorable to the government as the prevailing party, it is clear that the officers had reasonable suspicion to stop Gonzalez-Zea's car and conduct an investigatory *Terry* stop under the totality of the circumstances. The officers knew that a social security number associated with the fugitive Alfaro-Aguilar had been used recently to connect a utility service at the Heflin house. Thus, they had a specific, articulable, objective basis for believing that the fugitive could be found at that location. Additionally, when the officers observed Gonzalez-Zea leaving the house, it was in the pre-dawn hours of September 26, 2017. Given the time of day, the officers possessed an objective, reasonable suspicion that any man leaving the house was either the fugitive, or as a resident of the house, may have known the fugitive and his whereabouts. This information provided officers with sufficient particularized, reasonable suspicion to conduct an investigatory stop of Gonzalez-Zea. *See Hensley*, 469 U.S. at 229; *Kapperman*, 764 F.2d at 792.

To the extent Gonzalez-Zea argues that the ICE officers had to observe a traffic violation or suspicious behavior specific to Gonzalez-Zea before stopping

10

his vehicle,[6] his argument is unpersuasive because "[t]he touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Lewis*, 674 F.3d at 1306 (quoting *Samson v. California*, 547 U.S. 843, 855 n.4 (2006)). In fact, "[t]he Supreme Court has rejected efforts to limit investigative stops to situations in which the officer has personally observed suspicious conduct." *United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983). Rather, because reasonable suspicion "is not concerned with 'hard certainties, but with probabilities,'" *Lewis*, 674 F.3d at 1304, the investigative lead linking the social security number used by the fugitive Alfaro-Aguilar to a recently opened utility account at the Heflin house and the officer's observation of a male leaving the house in the pre-dawn hours were sufficient to justify the brief investigatory stop of the vehicle in order to confirm whether the driver was the fugitive the ICE officers were seeking.

Gonzalez-Zea also cites a number of traffic-stop cases for the proposition that police cannot conduct a random traffic stop to check a driver's license or question a driver about his citizenship status without any reasonable suspicion of

---

[6] Gonzalez-Zea acknowledges in his brief that this was a *Terry* stop, not a traffic stop. This contention is supported by the testimony of the ICE officers at the hearing on the motion to suppress that the vehicle stop was an investigatory stop to determine whether the male driver was the fugitive they were seeking—not a traffic stop. The ICE officers further testified that, even if they had witnessed a traffic violation, they lacked the authority to pull a vehicle over for a traffic violation or to issue traffic citations. Nevertheless, while this case is not a traffic-stop case, as we explained in *Lewis*, "cases involving traffic stops are nonetheless relevant in evaluating the reasonableness of investigatory detentions more generally." 674 F.3d at 1306 n.5.

criminal activity. As explained above, the *Terry* stop here was supported by the officers' reasonable suspicion, grounded in specific, articulable facts, that the fugitive they were looking for could be at the house in question, and that Gonzalez-Zea—a male seen leaving the house in the early morning hours—could have been that fugitive or could have known the fugitive's whereabouts. In short, this case is a far cry from the cases cited by Gonzalez-Zea wherein traffic stops based on a suspicion of mere potential general criminality were held to violate the Fourth Amendment. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 874 (1975) (explaining that "the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country" and "stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens"); *United States v. Yousif*, 308 F.3d 820, 827–28 (8th Cir. 2002) (holding that the police violated the defendant's Fourth Amendment rights by stopping every car that went through a checkpoint to look for drugs without having an articulable, reasonable suspicion that the vehicle or its occupants are subject to seizure for a violation of the law); *United States v. Jiminez-Medina*, 173 F.3d 752, 755 (9th Cir. 1999) (holding that an officer did not have reasonable suspicion to stop a vehicle simply because it was driving slowly, was a certain vehicle type, was on a known alien-smuggling corridor at an odd hour, and the driver seemed preoccupied).

12

Accordingly, for all the above reasons, we conclude that the officers had reasonable suspicion to justify the stop of Gonzalez-Zea's vehicle.[7]

We now must turn to the second step of the *Terry* inquiry—whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place—which leads us to Gonzalez-Zea's second issue.

## B. Whether the officers unlawfully prolonged the stop

Gonzalez-Zea argues that, even if the initial stop was valid, the officers unlawfully prolonged it when they asked for Gonzalez-Zea's identification and inquired as to whether he had any identification issued by the United States. According to him, the stop should have ended as soon as the officers observed that

---

[7] Gonzalez-Zea also argues that the officers' reliance on the reports linking the social security number to the Heflin house was unreasonable because the number was associated with both Alfaro-Aguilar and Sanchez (who had 26 aliases). In other words, he argues that the officers had to rule out all other possible users of the social security number before they could have a legitimate, reasonable suspicion that the fugitive Alfaro-Aguilar was using the social security number and might be located at the Heflin house. Gonzalez-Zea's argument conflates the concepts of what evidence is necessary to establish probable cause versus what is sufficient for reasonable suspicion—a much lower threshold. The Supreme Court has stated repeatedly that officers do not have to rule out every possibility of innocent conduct in order to possess reasonable suspicion to conduct an investigatory stop. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists [for an investigative stop] . . . need not rule out the possibility of innocent conduct."); *Wardlow*, 528 U.S. at 125–26 (explaining that even where there are "innocent reasons" for certain conduct, where officers have specific, articulable, reason to believe that criminal activity was, is, or is about to be afoot, *Terry* authorizes the officers to detain individuals to resolve that ambiguity). As discussed above, under the totality of the circumstances, the ICE officers had a reasonable suspicion to justify the stop in this case. *See United States v. Simmons*, 172 F.3d 775, 779 (11th Cir. 1999) (holding that police officers possessed reasonable suspicion and did not act unreasonably in detaining the defendant to investigate whether he was the subject of a warrant for a person with a similar name, even though the warrant was from a county on the other side of the state and the date of birth did not match the defendant's).

13

he did not match the physical description of Alfaro-Aguilar and at the latest when

Gonzalez-Zea told the officers his name, which did not match the fugitive's.

As explained previously, a *Terry* stop must also be "reasonably related in

scope to the circumstances which justified the interference in the first place."

*Terry*, 392 U.S. at 20; *see also Jordan* 635 F.3d at 1186.  Thus, an initially lawful

investigatory stop may become unlawful if it is "prolonged beyond the time

reasonably required to complete" the purpose of the stop.  *Rodriguez v. United

States*, 575 U.S. 348, 355–57 (2015); *Florida v. Royer*, 460 U.S. 491, 500 (1983)

(plurality opinion) ("An investigative detention must be temporary and last no

longer than is necessary to effectuate the purpose of the stop.").

As discussed previously, the officers had a reasonable suspicion that

Gonzalez-Zea could be the fugitive alien sought by ICE.  Therefore, the officers

stopped the vehicle leaving the Heflin house and immediately began asking a

series of questions to dispel promptly and quickly with the task of confirming

Gonzalez-Zea's identity.  Officer Skillern asked Gonzalez-Zea for his name and

for identification to confirm the name he gave.[8]  These identification questions

---

[8] To the extent Gonzalez-Zea argues that the officers were not permitted to ask him for supporting identification and should have just accepted the name he supplied to the officers at face value, his argument is unpersuasive.  As the Supreme Court has emphasized, "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops."  *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 186 (2004); *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993) (explaining that "[d]uring a *Terry* stop, officers may ask a suspect to identify himself or herself" and concluding that "the agents' request for identification and basic personal information was reasonable").  For this reason, Gonzalez-Zea's

were related in scope to the circumstances that justified the stop in the first place—confirming whether the driver of the vehicle was the fugitive.

Further, when Gonzalez-Zea produced an identification card from another country, Officer Skillern asked him whether he had any United States identification, and when Gonzalez-Zea stated that he did not, Officer Skillern asked why he did not have any United States identification.  Gonzalez-Zea argues that this additional identification inquiry "was a diversion from the purpose of the stop[] and an "impermissible foray into investigating unrelated criminal activity." We disagree.  Asking for an alternate form of identification simply was another identification-related inquiry that was part of the task of verifying Gonzalez-Zea's identity, which was the purpose of the *Terry* stop.  Although Gonzalez-Zea stated that he was in the United States illegally in response to Officer Skillern's questions, at no point during the stop did the officers investigate another crime or ask questions unrelated to verifying Gonzalez-Zea's identity and locating the fugitive.  The record establishes that Officer Skillern acted diligently and the overall *Terry* stop did not exceed the time needed to handle the matter for which

related argument that the officers were not permitted to ask him for his name or identification because they should have been able to confirm from a "cursory visual inspection" that he was not the fugitive Alfaro-Aguilar similarly fails.

15

the stop was made—verifying whether Gonzalez-Zea who was seen leaving the Heflin house was the fugitive and attempting to locate the fugitive.[9]

Accordingly, for all these reasons, we conclude that the officers did not unlawfully extend the stop.[10]

## C.    Whether Gonzalez-Zea voluntarily consented to the officers' search of the house

Gonzalez-Zea argues that the district court erred when it found that he voluntarily consented to the officers' search of his house because the totality of the circumstances weigh against the voluntariness of his consent. Specifically, he asserts that his consent was the product of an illegal road-side seizure. Further, he argues that even if his seizure was valid, his consent was not voluntary because the officers were armed, the stop occurred during the pre-dawn hours in a rural area,

---

[9] To the extent that Gonzalez-Zea relies on our post-*Rodriguez* interpretation in *United States v. Campbell*, 912 F.3d 1340 (11th Cir. 2019), as to what renders a traffic stop unreasonably prolonged, we note that following briefing and oral argument in this case, a majority of this Court voted to grant rehearing *en banc* in *Campbell*, and as a result we vacated the underlying panel decision, 981 F.3d 1014 (2020). Accordingly, *Campbell* is no longer good law and will not be discussed further.

[10] In arguing that the *Terry* stop was unreasonably prolonged, Gonzalez-Zea also appears to challenge whether the overall manner and length of the investigatory detention was reasonable. *See United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004) (explaining that when evaluating the overall reasonableness of the scope of a *Terry* stop, we apply "four non-exclusive factors": (1) "the law enforcement purposes served by the detention"; (2) "the diligence with which the police pursue the investigation"; (3) "the scope and intrusiveness of the detention"; and (4) "the duration of the detention." (quoting *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000)). To the extent that Gonzalez-Zea challenges the reasonableness of the manner and length of the detention, his argument fails as all four *Acosta* factors are satisfied in this case for the same reasons that the stop was not unreasonably prolonged.

16

the officers did not return his identification card, they left their red-and-blue lights on, and he was never told he was free to leave or that he had the ability to refuse consent.[11]  We disagree.

As an initial matter, as discussed previously, we conclude that the ICE officers had reasonable suspicion to conduct an investigatory stop with Gonzalez-Zea and that the officers did not prolong the stop.  Accordingly, it follows necessarily that Gonzalez-Zea's consent to the search of the Heflin house was not the product of an illegal seizure.  Consequently, we consider his alternative argument that, even if his seizure was valid, his consent was the product of the allegedly coercive circumstances.

A warrantless search "conducted pursuant to valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  In order to be valid, consent must be voluntarily given. *Id.*  Consent is voluntary "if it is the product of an 'essentially free and unconstrained choice.'" *United States v. Benjamin*, 958 F.3d 1124, 1134 (11th Cir. 2020).  Voluntariness of consent "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.  The government bears the burden of proving that

---

[11] To the extent that Gonzalez-Zea also argues that the officers should have informed him of his *Miranda* rights and that their failure to do so mitigates the voluntariness of his consent, his argument fails.  We have previously held that a consent to search is not a self-incriminating statement and that the failure to give a defendant a *Miranda* warning does not render the defendant's consent to search invalid. *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993).

17

"the consent was . . . freely and voluntarily given." *Id.* at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). A district court's determination that consent was voluntary is a finding of fact that will not be disturbed on appeal absent clear error. *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017). "Normally, we will accord the district judge a great deal of deference regarding a finding of voluntariness, and we will disturb the ruling only if we are left with the definite and firm conviction that the trial judge erred." *Id.*

When evaluating the totality of the circumstances underlying consent, we look at several factors, including "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).

Almost all of these factors point in one direction—that Gonzalez-Zea voluntarily consented to the search. The ICE officers did not coerce Gonzalez-Zea into providing his consent. Rather, after Gonzalez-Zea stated that he lived alone, the ICE officers simply asked if they could search the Heflin house. Gonzalez-Zea agreed without any hesitation, drove his own vehicle back to the house, unlocked the house to let the officers in, and cooperated throughout the search. He was neither in custody nor restrained in any manner at the time he gave consent.

18

Further, testimony at the suppression hearing confirmed that Gonzalez-Zea "didn't have any objection at all," when asked for his consent and his interaction with the ICE officers was "friendly" and "cordial." Although the officers were armed during the interaction with Gonzalez-Zea, they never removed their weapons. Officers routinely carry weapons while on duty and, therefore, the mere presence of a weapon on an officer does not render an encounter with an officer unduly coercive and is insufficient to render a defendant's consent involuntary. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) (explaining, in the context of determining whether an individual was seized or engaged in a consensual encounter with immigration officers, that "[t]he presence of holstered firearm is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon").

Likewise, the fact that the red-and-blue police lights were activated on Officer Skillern's vehicle during his interaction with Gonzalez-Zea did not affect the voluntariness of Gonzalez-Zea's consent. Leaving police lights on is simply not a display of force or coercive conduct on the part of an officer that could affect an individual's decision to freely and voluntarily consent to a search. *See Schneckloth*, 412 U.S. at 233 (noting that involuntary consent is consent that is "coerced by threats or force, or granted only in submission to a claim of lawful authority").

19

Additionally, while the fact that the defendant's identification was not returned at the time he consented to the search "is a factor we . . . consider in evaluating the totality of the circumstances," "it is not a litmus test for voluntary consent." *Purcell*, 236 F.3d at 1282. Here, there is no indication that the officers gave Gonzalez-Zea back his identification card at or before the time they asked for his consent to search the house. Nevertheless, in light of the friendliness of the encounter, Gonzalez-Zea's lack of any objection to the search, and the absence of any coercive behavior by the officers, under the totality of the circumstances, the failure to return Gonzalez-Zea's identification card is insufficient to render his consent involuntary.[12]

While Gonzalez-Zea takes issue with the fact that the ICE officers failed to advise him expressly that he had a right to refuse consent, the Supreme Court "has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless

---

[12] Gonzalez-Zea cites two cases—*United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999), and the Tenth Circuit's decision in *United States v. Mendez*, 118 F.3d 1426, 1430 (10th Cir. 1997)—in support of his contention that his consent was rendered involuntary by the officers' failure to return his identification card. *Pruitt*, however, did not involve the issue of the voluntariness of the defendant's consent because the defendant did not consent to a search. 174 F.3d at 1218. And in *Mendez*, the Tenth Circuit addressed the issue of the officer's retention of the driver's identification in the context of determining whether a traffic-stop became a consensual encounter, not when determining whether the driver's consent to search the vehicle was voluntary. 118 F.3d at 1430–31. *Mendez* certainly does not stand for the *per se* rule that an officer's retention of an individual's identification renders an individual's consent involuntary. *Id.* at 1432. Moreover, even if *Mendez* stood for such a rule, we would not be bound by it. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) ("Under the established federal legal system the decisions of one circuit are not binding on other circuits.").

20

consent search." *Drayton*, 536 U.S. at 206; *Schneckloth*, 412 U.S. at 234 ("[N]either this Court's prior cases, nor the traditional definition of 'voluntariness' requires proof of knowledge of a right to refuse as the sine qua non of an effective consent to search."). Rather, the Supreme Court has emphasized repeatedly "that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning." *Drayton*, 536 U.S. at 206–07. Here, although the ICE officers did not inform Gonzalez-Zea of his right to refuse consent, there is no claim (or evidence of record) that the officers took any action that would have suggested to Gonzalez-Zea that he had no right to refuse the request to search the house. Given the lack of any coercive behavior on the part of the ICE officers, "[t]he mere fact that [the officers] did not inform [Gonzalez-Zea] of his right to refuse consent . . . is insufficient to render [his] consent involuntary." *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

Relatedly, Gonzalez-Zea argues that his consent was involuntary because the officers did not inform him that he was free to go, but the Fourth Amendment does not require that a defendant be advised that he is "free to go before [his] consent to search may be deemed voluntary." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). Thus, the absence of this notification does not render Gonzalez-Zea's consent involuntary, particularly in light of the totality of the circumstances discussed above.

21

Accordingly, for the above reasons, we conclude that the district court did not clearly err in finding that, based on the totality of the circumstances, Gonzalez-Zea voluntarily consented to the search of the Heflin house.

## IV.    Conclusion

For these reasons, we affirm the district court's denial of Gonzalez-Zea's motion to suppress.

**AFFIRMED.**