[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10734

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARCO ANTONIO GALVAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:23-cr-00102-ACA-NAD-1

_____

Before JORDAN, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

Marco Galvan appeals the denial of his motion to suppress evidence obtained from a search of his car following a traffic stop by law enforcement.  Galvan maintains that the officers lacked reasonable suspicion to prolong the stop, which led to the discovery and seizure of nearly eleven kilograms of cocaine from a secret compartment in his car.  After careful review, we affirm the denial of the motion to suppress.

## I.

On April 26, 2022, Officer Lakenderick Edwards of the Hoover Police Department, a member of a highway safety task force, was on patrol monitoring eastbound traffic on Interstate 20 just outside of Birmingham near Leeds, Alabama.  He saw a Nissan Altima follow another vehicle too closely, so he pulled behind the Altima.  At least one other car was between Edwards and the Altima.  Though Edwards had not activated his lights or siren, the Altima took the next exit, behavior Edwards associated with "somebody who wants to avoid law enforcement."  Edwards followed the Altima and initiated a stop after it crossed a fog line.  The Altima pulled into a parking space near the gas station, and Edwards parked behind.

Edwards walked to the passenger's side of the Altima and told the driver, Galvan, that he had been stopped for following too closely, but that he would receive a warning, not a ticket.  Edwards

noticed that Galvan was "shaking a little bit, nervous a little bit," and he intended to ease Galvan's nerves by reassuring him he would not get a ticket.  Edwards asked for Galvan's license and insurance.  Galvan had neither with him.  Instead, he provided a non-governmental photo ID card issued by "LUPE."  Edwards did not recognize that form of ID.

Meanwhile, Edwards asked Galvan whether he owned the car.  Galvan claimed that the car belonged to his uncle, who had recently bought it, but he was unsure if his uncle had changed the title yet.  Edwards did not request the car's registration or the name of Galvan's uncle.  Edwards next asked Galvan about his work. Galvan stated that he worked in "construction" and was going to be at a job site "very close to Birmingham."  Edwards asked Galvan if he drove from Texas to Birmingham or if he lived in Birmingham, and Galvan responded that he lived in Texas, and it was his first time in Birmingham.

Then Edwards asked Galvan to step out of the car while he wrote a warning.  In the meantime, Edwards retrieved his citation booklet from his patrol SUV before joining Galvan near the front of the vehicle and continuing to question him.  Edwards asked if Galvan had a license, and Galvan said that he did, but he did not bring it with him because he was rushing to leave.  Edwards also asked how long Galvan had been driving.  Galvan responded, "more than twelve hours," and said he was coming from Houston. He elaborated that he started driving from the address listed on the LUPE ID card, which was in Edinburg, Texas, and then "picked up

the car" in Houston, after his own car broke down.  Galvan added that he had family in Houston and that he was in Birmingham just for work.

More questions followed.  Asked how long he planned to be in the area, Galvan responded that he was unsure because he was starting construction work on a new neighborhood development. Galvan explained that he began work the next day, and that he had been heading to the hotel when Edwards pulled him over.  He believed the hotel was a Hilton, and that it was nearby, though he did not know the hotel's address and was relying on GPS and the "other guys" in his work crew, who he said were waiting for him.  Edwards told Galvan to wait while he attempted to locate his license.

Back in his patrol car, Edwards radioed his partner, Tyler Watson.  He told Watson he found Galvan's story suspicious and requested backup.  If Galvan was heading to the Hilton, Edwards thought, he was "way past his destination" and heading in the wrong direction.  Next, Edwards used his computer to search two license-plate reader systems to confirm Galvan's story and to see if he had traveled through any well-known "drug corridors."  But Edwards's searches did not return anything suspicious.

Edwards then searched the NCIC system and Google, attempting to confirm Galvan's identity.  Although Galvan confirmed his name and birthdate for Edwards, and that he had a Texas license, Edwards could find no record for him.  While in his patrol car, Edwards observed Galvan's demeanor in front of the car.

Edwards noticed that Galvan was "pacing" and "fidgety," which further raised Edwards's suspicions.

By this time, other officers had arrived on scene. Edwards spoke briefly with Watson and then asked another officer if a drug-sniffing dog was available. He then walked back to Galvan, stating that he could not find a license for him. Galvan confirmed that the information on the LUPE ID card was accurate, explaining that the card had been issued by a Texas organization that assisted undocumented immigrants, even though Galvan himself was authorized to be in the United States. Edwards returned to his car and continued searching for Galvan's license on his computer, but to no avail.

Edwards then returned to Galvan, who volunteered a Social Security number. At that point, Edwards asked Galvan if there was "anything illegal inside his vehicle," such as cocaine, marijuana, or crystal, or any large sums of money. Galvan denied each question.

After trying a computer search using Galvan's Social Security number, Edwards asked for consent to search the car. Edwards believed that Galvan still appeared nervous (more so than earlier in the encounter), but he no longer seemed shaky. Galvan consented to the search, which ultimately led to the discovery of a hidden compartment containing nearly eleven kilograms of cocaine. During the search of Galvan's Altima, a supervising officer was able to locate Galvan's Texas license, using his Social Security number, through an application to which Edwards lacked access.

**II.**

6                         Opinion of the Court                    24-10734

After his indictment on one count of possession with intent to distribute cocaine, *see* 21 U.S.C. § 841(a)(1) & (b)(1)(C), Galvan moved to suppress evidence from the traffic stop.

At an evidentiary hearing before a magistrate judge, the government called Edwards to testify about the traffic stop. The government also offered body-worn camera video from both Edwards and Watson. Following the hearing, the magistrate judge made factual findings and conclusions of law in a report and recommendation.

In relevant part, the magistrate judge found that Edwards had provided "fully credible testimony." And based on the evidence, the magistrate judge concluded that Edwards had reasonable suspicion of criminal activity when he first diverted from the purpose of the traffic stop by radioing his partner to discuss his suspicions and searching the license plate reader system. And according to the magistrate judge, reasonable suspicion had not dissipated by the time Galvan consented to a search of his vehicle. The judge reasoned that, although Galvan gave a plausible story of legal conduct, Edwards had the necessary reasonable suspicion based on the totality of the circumstances, which included "the circumstances of Galvan's vehicle; the circumstances of Galvan's travel; and Galvan's nervousness." Thus, the magistrate judge recommended denying the motion to suppress.

Galvan filed objections to the report and recommendation. As to the report's factual findings, Galvan objected only to the finding that he was shaking during the initial encounter. Galvan argued

that finding was "not supported by the body camera footage." As for the report's legal conclusions, Galvan maintained that the factors cited by the district court were insufficient to establish reasonable suspicion of criminal activity.

The district court overruled Galvan's objections. The court declined to disturb the factual finding that Galvan was "shaking" during the initial contact, given Edwards's credible testimony on that point. And the court agreed that reasonable suspicion existed to extend the traffic stop. The court adopted the magistrate judge's report and recommendation and denied the motion to suppress.

Thereafter, Galvan entered a conditional guilty plea, reserving the right to appeal the denial of the motion to suppress. The district court sentenced him to 65 months of imprisonment, and this appeal followed.

### III.

We review the district court's denial of a motion to suppress evidence under a mixed standard, reviewing the court's findings of fact for clear error and its application of the law to the facts *de novo*. *United States v. Lewis*, 674 F.3d 1298, 1302–03 (11th Cir. 2012). We grant substantial deference to both the explicit and implicit credibility determinations of the district court acting as factfinder, construing all facts in the light most favorable to the prevailing party in the district court. *Id.* at 1303.

### A.

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354, (2015). But "the scope of the stop must be carefully tailored to its underlying justification." *United States v. Campbell*, 26 F.4th 860, 882 (11th Cir. 2022) (*en banc*) (quotation marks omitted).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 355 (cleaned up). We have also said that, in general, questions about an individual's "travel plans and itinerary," or about "ownership of the vehicle [he] was driving," are ordinary inquiries incident to a traffic stop. *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021). Authority for a traffic-stop seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354.

In addition, "[a]n officer may conduct certain unrelated checks during an otherwise lawful traffic stop so long as the officer does not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Braddy*, 11 F.4th at 1310 (quotation marks omitted). Without

reasonable suspicion, any prolongation of the stop for unrelated investigation is unlawful. *Campbell*, 26 F.4th at 884. That is, "to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." *Id.*

"Reasonable suspicion is not concerned with hard certainties, but with probabilities." *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1302 (11th Cir. 2021). Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but there must be "at least a minimal level of justification." *Id.* (quotation marks omitted). The necessary justification may come from "observing exclusively legal activity," *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (quotation marks omitted), along with "commonsense judgments and inferences about human behavior," *Gonzalez-Zea*, 995 F.3d at 1303 (quotation marks omitted). Nonetheless, "the officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* (quotation marks omitted). "In determining whether reasonable suspicion is present, we look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing," giving "due weight to the officer's experience." *Braddy*, 11 F.4th at 1310–11 (quotation marks omitted). "Nervous, evasive behavior is a relevant factor to be considered in the totality of the circumstances." *United States v. Bishop*, 940 F.3d 1242, 1248 (11th Cir. 2019) (cleaned up). In addition, "the inability to offer proof of ownership or

authorization to operate the vehicle" may contribute to reasonable suspicion. *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999). Likewise, "inconsistencies in travel plans can give rise to a reasonable suspicion." *United States v. Boyce*, 351 F.3d 1102, 1109 (11th Cir. 2003). In particular, "conflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these questions and because the driver may be trying to hide" his destination. *Id.*

## B.

Officer Edwards initially stopped Galvan for following a car too closely. Galvan contends that Edwards then unlawfully prolonged the traffic stop. He asserts that, approximately five minutes later, Edwards conducted unrelated criminal inquiries, including calling his partner to relay his suspicions about Galvan's story and searching the license-plate reader system. The government assumes that these inquiries were "unrelated to the original traffic violation and added time to Galvan's stop," and instead argues that the facts we've already recited supported reasonable suspicion. So the only question presented is whether this assumedly unrelated prolongation of the stop was supported by reasonable suspicion.

Viewed in the light most favorable to the government, the prevailing party below, the record shows that reasonable suspicion existed to extend the stop for nontraffic-related inquiries. *See Lewis*, 674 F.3d at 1302–03. At the time he radioed his partner and searched the license-plate reader systems, Officer Edwards "ha[d] a

particularized and objective basis for suspecting legal wrongdoing." *Braddy*, 11 F.4th at 1310–11.

Before initiating the traffic stop, Officer Edwards observed Galvan taking the next exit once Edwards pulled behind him, even though Edwards didn't activate his lights. Edwards explained that he associated this behavior with "somebody who wants to avoid law enforcement." *See Bishop*, 940 F.3d at 1248 (evasive behavior is a relevant factor). Galvan was "nervous" and "shaking" during the initial encounter, and, according to Edwards, his nervousness did not dissipate even after Galvan told him he would receive a warning only. *See United States v. Simms*, 385 F.3d 1347, 1354 (11th Cir. 2004) (citing the defendant's "continued nervousness even after he found out he would only be receiving a warning"). Edwards soon learned that Galvan was from out of state, that he did not have a valid driver's license in his possession, and that he did not own the vehicle or know the record owner. *See United States v. Pruitt*, 174 F.3d 1215, 1221 n.4 (11th Cir. 1999) (indicating that "the inability to offer proof of ownership or authorization to operate the vehicle" may support reasonable suspicion).

Upon further inquiry by Edwards, Galvan gave inconsistent or exceedingly vague details about his travel and work plans. *See Boyce*, 351 F.3d at 1109 ("[I]nconsistencies in travel plans can give rise to a reasonable suspicion."). Galvan had been driving for more than twelve hours, purportedly to begin a construction job near Birmingham the next day. But at the time of the traffic stop, Galvan was in the outskirts of Birmingham, close to the county line,

and heading away from that city and towards Atlanta. While Galvan supposedly had borrowed a recently purchased car from his uncle to get there, he had no idea how long the construction job would last. Galvan also told Edwards that he was driving to his hotel, which he thought "was the Hilton, if [he was] not mistaken," but could not provide the hotel's location, and according to Edwards, Galvan had already passed and was traveling away from the only Hilton in the vicinity, which was downtown. Edwards thought that these answers suggested that Galvan may have been "trying to hide" his actual destination. *Boyce*, 351 F.3d at 1109.

Galvan responds that the facts that the district court cited were susceptible to innocent explanations. Galvan notes that Edwards acknowledged that it was not uncommon for people to get nervous during a traffic stop or to borrow a relative's vehicle, and he argues that his lack of certainty about his work and travel plans did "not strongly suggest criminal activity." But our analysis "is controlled by the totality of the circumstances, and reasonable suspicion may thus exist even if each fact alone is susceptible of innocent explanation." *Bishop*, 940 F.3d at 1249–50 (quotation marks omitted); *see Acosta*, 363 F.3d at 1145 (reasonable suspicion may arise from "observing exclusively legal activity").

Having reviewed the body-camera video, along with Officer Edwards's testimony, which the district court found to be fully credible, we cannot say that any prolongation of the stop for unrelated checks lacked the support of reasonable suspicion. In particular, reasonable suspicion was supported by Galvan's failure to offer

proof of ownership or authorization to operate the vehicle, Edwards's observations of Galvan's evasive and nervous behavior, and Galvan's vague and seemingly conflicting answers about his travel and work plans. *See Bishop*, 940 F.3d at 1248; *Simms*, 385 F.3d at 1354; *Boyce*, 351 F.3d at 1109; *Pruitt*, 174 F.3d at 1221 n.4. Based on these factors, Edwards had objective grounds for suspecting that Galvan's long-distance travel in a vehicle he did not own involved criminal activity.[1] *See Braddy*, 11 F.4th at 1310–11.

For these reasons, we affirm the denial of Galvan's motion to suppress and his resulting conviction.

**AFFIRMED.**

---

[1] We also note that, as part of the traffic stop, the officers were entitled to detain Galvan for the purpose of verifying his driver's license. And notably, the officers could not confirm Galvan's out-of-state license until they used a database to which Officer Edwards lacked access—an event that occurred after Galvan had consented to the search of his car.